**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. ELH-19-0280** |
| | * | |
| **MARQUIS WEAVER** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

## OPPOSITION TO MOTION FOR RELEASE

On April 20, 2020, the defendant filed a motion for release.  The only novel claim in this motion is that COVID-19 is a changed circumstance meriting the defendant's release.  This Court recently has denied similar claims by detainees (such as this defendant) housed in facilities run by the D.C. Department of Corrections ("DOC").  *See, e.g., United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Rivas*, TDC-19-417 (D. Md.), ECF No. 72 (Order by Magistrate Judge Sullivan); *United States v. Chriscoe*, TDC-20-46 (D. Md.), ECF No. 131 (Order by Magistrate Judge Coulson); *United States v. Beamon*, PX-19-570 (D. Md.), ECF No. 37 (Order by Judge Xinis); *United States v. Gibson-Bey*, RDB-19-563 (D. Md.), ECF No. 26 (Order by Magistrate Judge Coulson); *United States v. Gray*, GJH-19-407, ECF No. 120 (Order by Judge Hazel); *United States v. Tucker*, GJH-19-555 (D. Md.), ECF No. 26 (Order by Magistrate Judge Day); *United States v. Harper*, PX-19-231 (D. Md.), ECF No. 39 (Order by Magistrate Judge Sullivan); *United States v. Remarque*, PX-19-39 (D. Md.), ECF No.

90 (Order by Magistrate Judge Sullivan); *United States v. Sturmer*, GJH-18-468 (D. Md.), ECF No. 292 (Order by Judge Hazel); *United States v. Clemons*, RDB-19-438 (D. Md.), ECF No. 49 (Order by Chief Magistrate Judge Gesner); *United States v. Christian*, DKC-20-19 (D. Md.), ECF No. 23 (Order by Magistrate Judge Coulson); *United States v. Stewart*, PX-17-352 (D. Md.), ECF No. 279 (Order by Magistrate Judge Sullivan); *United States v. Ozor*, GJH-19-289 (D. Md.), ECF No. 63 (Order by Judge Hazel); *United States v. Pate*, PWG-17-236 (D. Md.), ECF No. 53 (Order by Magistrate Judge DiGirolamo); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 92 (Order by Judge Chuang);  *United States v. Cleckley*, TDC-18-344 (D. Md.), ECF No. 485 (Order by Judge Chuang); *United States v.* Ray, TDC-19-215 (D. Md.), ECF No. 76 (Order by Magistrate Judge Day); *United States v. Attia*, PWG-19-193 (D. Md.), ECF No. 53 (Order by Magistrate Judge DiGirolamo); *United States v. Bland*, PWG-15-141 (D. Md.), ECF No. 95 (Order by Magistrate Judge Day).  Because the defendant's generic argument about confinement conditions runs counter to the individualized determination required by the Bail Reform Act, and because the defendant has failed to make a sufficient factual showing to merit the relief sought (*i.e.*, release from custody), this Court should do the same and deny the motion, without a hearing.

## Background

On April 15, 2019, the defendant was arrested after investigators conducted a car stop and recovered a loaded firearm.  Initially, the defendant was charged in state court and remained in state custody until he was arrested pursuant to a federal indictment.

On July 10, 2019, the defendant along with five co-defendants were initially charged by Superseding Indictment with four counts that included one count of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) as well

as two counts of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1).  ECF 21.

On July 19, 2019, Magistrate Judge Copperthite held a detention hearing, at the conclusion of which he found by clear and convincing evidence that the defendant posed a risk to the safety of other persons and the community and that there was no condition or combination of conditions that would reasonably assure community safety.  ECF 52.  Magistrate Judge Copperthite highlighted several factors that supported his position for detention.  Specifically, he noted that this was a "presumption case" and the defendant had not rebutted the presumption.  *Id.*  Additionally, Magistrate Judge Copperthite noted the defendant's criminal history and indicated that the defendant had "three prior drug felonies" and these "charges are from a Title III wiretap" and the "defendant was intercepted."  *Id.*  The Court further noted that "defendant was arrested with a co-defendant after an intercepted conversation" and there was a "gun recovered under the defendant's feet."  *Id.*  Magistrate Judge Copperthite ultimately noted that the "drug organization was associated with firearms and violence."  *Id.*

On December 11, 2019, the defendant was charged in a Second Superseding Indictment with an additional count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g), which carries a sentence up to 10 years.  ECF 124.  The defendant was arraigned on February 14, 2020 and his detention status remained the same.

On April 20, 2020, the defendant filed the pending motion for release and requested a detention hearing.  ECF 181. The defendant's only new argument in favor of release is speculation regarding COVID-19.  As detailed below, the motion should be denied without a hearing.

**Argument**

The defendant relies on the COVID-19 outbreak at the Correctional Treatment Facility ("CTF"), the pretrial facility where he currently is housed.  While the Government understands that a number of DOC inmates have been diagnosed with COVID-19,[1] and that others have test results pending, well over half of the DOC defendants previously diagnosed with COVID-19 have now recovered and returned to general population.  Moreover, as described further below, CTF continues to take precautionary measures to prevent further transmission of COVID-19 in CTF and treat those detainees who have tested positive, and DOC is now under the oversight of the United States District Court for the District of Columbia pursuant to litigation in that court.[2]  The defendant's motion should be denied, without a hearing.[3]

## I.     Legal Standard

---

[1] On April 13, 2020, a COVID-positive CTF detainee died.  According to a press report, the detainee was diagnosed with the virus on April 7, 2020, and placed in isolation before being transferred to a hospital.  According to a public court filing, the detainee was 51 years old, "has diabetes and has multiple health issues related to that diagnosis."  The detainee had been charged with first-degree murder in D.C. Superior Court.

[2] On April 19, 2020, United States District Court Judge Kollar-Kotelly issued an opinion and order in *Banks v. Booth*, 20-cv-849 (D.D.C.) granting in part and denying in part a motion for temporary restraining order (TRO) in a lawsuit brought against D.C. Jail and the Central Treatment Facility ("CTF"), and ordering D.C. Jail and CTF to take particular remedial steps discussed further below. *See Banks*, 20-cv-849, ECF 48 and 49. Most importantly, for the purposes of the defendant's motion, Judge Kollar-Kotelly did not order the release of prisoners as a remedy under the TRO. See ECF 49, at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.")

[3] A defendant may appeal a Magistrate Judge's detention order to the District Court.  18 U.S.C. § 3145(b).  In considering such an appeal, the District Court reviews the Magistrate Judge's detention order *de novo*.  *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001).  Thus, the District Court must make "an independent determination of the proper pretrial detention or conditions of release."  *Id.*  The district court need not conduct a new pretrial detention hearing; rather, the court may base its decision on the original detention hearing and any additional evidence proffered by counsel.  *See United States v. Williams*, 753 F.2d 329, 331 & n.7 (4th Cir. 1985).

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Magistrate Judge Copperthite relied in ordering detention.  These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  Because of the nature of the charges against the defendant, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).

Additionally, the Bail Reform Act permits the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  This section is discussed further in Section VI below.]

While it's unclear if the defendant is appealing Magistrate Judge Copperthite's detention order, it is clear that a defendant may do so.  18 U.S.C. § 3145(b).  In considering such an appeal, the District Court reviews the Magistrate Judge's detention order de novo.  *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001).  Thus, the District Court must make "an independent determination of the proper pretrial detention or conditions of release."  *Id.*

II.     **The Defendant's Motion Ignores Nearly All of the § 3142 Factors, Which Weigh Heavily in Favor of Detention.**

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

A.     **The Nature and Circumstances of the Offense**

Marquis Weaver, the defendant, was indicted along with five defendants in a wiretap drug conspiracy arising out of an investigation into a southwest drug trafficking organization.  In August 2018, the FBI initiated an investigation into Jebriel ALI a/k/a "Bril" as a narcotics trafficker in Baltimore, Maryland.   Investigators identified ALI as the leader of the drug trafficking organization (the "ALI DTO") that operated at the intersection of Frederick Avenue and Collins Avenue, Baltimore, Maryland which is located on the southwest side of Baltimore City also known as the Irvington Community.  During a four-month wiretap investigation, investigators intercepted ALI as well as other members of the drug trafficking organization to include the defendant.  FBI investigators intercepted phone calls during which the defendant and his co-conspirators discussed drug trafficking activity and firearms.  In addition to the wiretap surveillance, investigators also conducted physical surveillance.  The wiretap included several instances in which law enforcement took proactive enforcement actions and seized drugs and/or guns.  Several of the interventions included instances in which investigators received information that ALI or others might be planning an act of violence or a firearms transaction, and proactive action was taken to intervene and prevent such an act.  One such action occurred on April 15, 2019 in which investigators seized a firearm from the defendant during a car stop.  ALI was also present.

B.     **Weight of the Evidence**

The evidence against the defendant is overwhelming.  The defendant was an associate of ALI and worked for the DTO.  Prior to the car stop on April 15, 2019, the FBI intercepted a call

between two of ALI's intercepted phones.  It appears that ALI was using one phone to check the voice mail on his other phone.  During the connection, a background conversation was captured: ALI was heard talking with an unknown male (UM) talking about a gun:

| | |
|---|---|
| ALI: | Gun on you? |
| UM: | You about to get it man. |
| ALI: | You got your Gun on you? You got your Gun on you? |

Following the interception of the above call, and in light of the concern that ALI might be planning something involving a firearm, FBI responded to seize the firearm discussed in the intercepted communication.  Investigators conducted surveillance and located the defendant and ALI exiting an IHOP restaurant.  The defendant then entered the driver side of a vehicle and ALI entered the front passenger side of the same vehicle and drove off.  Investigators conducted a car stop and prior to stopping the car, investigators observed the defendant reaching towards the floorboard area in the driver's side of the car.  The car was searched and investigators found a loaded Sig Sauer P250 45 Auto, pistol semi-automatic serial number 57C019950 containing seven .45 caliber rounds.  The gun was found under the floor board behind the pedals on the driver side of the car.  Additionally, DNA evidence confirmed that the defendant's DNA was found on the firearm.

### C.      History and Characteristics of the Person

The defendant has several prior felony drug convictions (2010, 2012, and 2014).  The defendant's criminal record also includes a second degree assault conviction (2008) and one possession drug charge (2010).  As to these two convictions, he violated the terms of his probation. Based on his criminal conduct, the defendant has accrued 12 criminal points, placing him at a Criminal History V, the criminal history category in the U.S. Sentencing Guidelines.  If he were convicted of a controlled substance offense, the defendant would be looking at significant time up

to 96 months incarceration.  However, the defendant qualifies for the Armed Career Criminal based on the fact that the defendant has at least three prior felony convictions.  As such, his criminal history category is a IV pursuant to U.S.S.G. § 4B1.4(c)(3).  Additionally, there is a 15 year mandatory minimum based on the defendant meeting the requirements of an Armed Career Criminal. 18 U.S.C. 924 (e)(1).

> ### D.    The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

The government cannot overstate the danger that firearms have upon our community. Here, the defendant possessed a loaded firearm and coupled with his extensive criminal history, the defendant's release would pose a serious risk to the community in the form of handgun violence and/or damage to the public health through the distribution of dangerous guns.  Judge Coulson noted in a recent opinion denying a motion for pretrial release based on COVID-19, "Baltimore City had nearly 350 homicides in 2019—almost 60 per every 100,000 citizens. There were more than 700 nonfatal shootings.  According to the Maryland Department of Health and the Office of the Chief Medical Examiner, there were almost 1000 additional deaths attributable to heroin, fentanyl and/or opioid overdose."  *Gibson-Bey*, RDB-19-0563 (D. Md.), ECF 26, at 3 (internal citations omitted).  Magistrate Judge Copperthite previously weighed these risks and determined that the defendant was a danger to the community and there were no conditions of release that could be placed on the defendant that would reasonably assure the safety of the community.  ECF 52.  The analysis has not changed with the new request for release.   As such, the defendant should remain detained.

III.     **D.C. Department of Corrections Has Established Procedures with Respect to the COVID-19 Outbreak that Are Now Being Overseen by the United States District Court for the District of Columbia.**

The defendant's motion focuses almost exclusively on the health risks posed by COVID-19 and ignores the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis.  18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  The defendant does not allege that he has COVID-19.  In this way, he is not seeking release based on his *actual* "physical and mental condition."  Instead he relies solely on the possibility of becoming infected.  As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented precautionary measures to mitigate this risk, continues to evolve its policies and procedures to address the unprecedented COVID-19 pandemic, and is being closely supervised in its ongoing efforts as part of the *Banks* litigation in the United States District Court for the District of Columbia.

A.     **DOC Has Instituted Precautionary Measures to Avoid Further Transmission of COVID-19 and Ensure Adequate Medical Care for Those Infected.**

DOC has implemented a number of precautionary measures based on guidance from the D.C. Department of Health and the Centers for Disease Control ("CDC") to mitigate the risks associated with COVID-19, including restrictions on visitation to the facility, screening and quarantine of inmates, increased provision of masks and other personal protective equipment ("PPE") to staff and inmates, continued education of staff and inmates about the spread of COVID-19 and ways to combat it, cancellation of group activities, and restrictions on out-of-cell time.  As

additional measures are implemented, DOC continues to alert the public. *See* https://doc.dc.gov/page/coronavirus-prevention (last accessed April 20, 2020).[4]

The Government acknowledges that Judge Kollar-Kotelly found that many of DOC's measures prescribed by policy have not been properly implemented (at least as of the time independent inspectors visited the facility on three occasions between April 10 and April 12), further measures are needed, and further education of staff and inmates regarding the measures that exist is necessary. *See generally*, *Banks*, Mem. Op., ECF 49.  Notably, however, Judge Kollar-Kotelly declined to grant the requested injunctive relief of releasing prisoners. *See id.* at 26.

As Judge Kollar-Kotelly recognized, "COVID-19 poses an unprecedented challenge and the precautionary measures taken by [DOC] are rapidly evolving."  *Banks*, Mem. Op., ECF 49, at 16; *see also id.* at 15 (recognizing that DOC's "response to this sudden and unprecedented pandemic is ongoing").  With the recognition that DOC's response continues to evolve, Judge Kollar-Kotelly issued an extensive order to remediate the deficiencies in DOC's implementation of its policies, including:

- ensuring proper triage process for sick call requests;

- ensuring medical staff are promptly informed of inmates who present with symptoms of COVID-19;

- providing better documentation of sick calls and the outcomes of same;

- ensuring proper monitoring of cell restrictions;

- ensuring appropriate housing for inmates in quarantine;

---

[4] The DOC webpage is updated regularly with announcements, policy descriptions, and answers to frequently asked questions.

- consulting with public health professionals regarding strategies that can be implemented to strengthen COVID-19 related education;

- conducting additional staff training on use of thermometers;

- providing consistent and reliable access to legal calls;

- ensuring proper social distancing;

- ensuring proper use and communication to staff regarding use of PPE;

- strengthening the environmental health and safety program;

- assessing whether any additional security staff are needed to provide appropriate supervision for social distancing; and

- ensuring that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters.[5]

On April 17, 2020, DOC Director Quincy L. Booth also issued a memorandum to all employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures". *See Banks*, Report Submitted by *Amicus Curiae* Pursuant to April 9, 2020 Consent Order, ECF 47, Ex. 11. Director Booth's memorandum, which directly addresses many of the concerns raised by the independent inspectors as part of the *Banks* litigation, both reminds staff of existing procedures and provides several updated procedures, including the following:

- **Social Distancing:** Correctional officers must enforce social distancing at all times. There shall be multiple daily announcements over the public address system reminding staff and resident of the need for social distancing. Strict limits also are placed on the number of people who can be out of their cells at one time (generally no more than six). Group activities shall continue to be suspended during the emergency period.

- **Residential Out of Cell Time:** Inmates are restricted to one hour out of their cells each day, and there will be PA announcements reminding inmates of this rule.

---

[5] *See Banks*, Order, ECF 48; *see also* Mem. Op., ECF 49, at 27-31.

- **Personal Protective Equipment:**  DOC shall conduct refresher courses on the proper use of PPE for staff during roll call on each shift and such courses shall be documented.  DOC's medical staff and sick call staff shall visit DOC housing units to refresh staff and residents on PPE use, COVID prevention, and how to submit sick call slips for medical units, and such refreshers shall be documented.

- **Isolation Units:**  All residents in isolation shall be allowed to shower once per day, shall be allowed 30-minute legal calls per day on an unmonitored "rolling phone" that will be transported to the inmate's cell, and shall be provided tablets with entertainment and education content, as well as activity packets.

- **Unit Common Area and Cell Cleaning:**  At the beginning of each shift, correctional officers shall document the amount of cleaning supplies available and report any shortages, provide cleaning products on towels or paper towels for inmates to clean cells, verify and document that common areas are cleaned, and post listings of cleaning products available to residents in each housing unit.

- **Linen and Laundry Exchanges:**  Each week, DOC shall provide residents with fresh clothing, undergarments, and linens, and collect used items.

- **Contractor and Staff Screening and Hygiene:**  All staff and contractors entering DOC facilities will continue to undergo a COVID-19 screening, including temperature checks and answering questions related to COVID-19 symptoms. Staff conducting the screenings will be re-trained in the use of thermometers. Following the screening, staff shall properly wash their hands before entering the facility.  Non-essential visitors will be excluded from the facility.  Any staff that have been in sustained, close contact with someone who has tested positive will be informed.

- **Access to Legal Calls:**  All residents shall be allowed 30-minute legal calls daily. DOC staff will also cooperate to facilitate incoming calls from attorneys.

- **Medical Care:**  If DOC staff observe an inmate exhibiting symptoms of COVID-19, staff shall direct that person to medical staff.

- **Additional Measures:**  DOC is also working to make better use of single cells where possible, is increasing staff through the Medical Reserve Corps to assist with provision of medical care and temperature checks, is trying to obtain additional tablets for residents to use during the duration of the emergency period, is increasing monitoring of inmates placed on quarantine, and will request deployment of mobile COVID-19 testing within DOC facilities when it becomes available.

The defendant's motion does not allege that these enhanced measures are insufficient to address the needs of detainees generally or the defendant in particular.  Rather, the defendant's motion simply recounts the deficiencies identified by Judge Kollar-Kotelly that DOC has been ordered to remediate under the close supervision of the United States District Court for the District of Columbia.  This information does not merit the defendant's release.

Indeed, Judge Kollar-Kotelly's Order specifically denied the *Banks* plaintiffs' request for the release of prisoners as not called for by the record.  *See, e.g., Banks*, ECF 49 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.").  The *Banks* Order instead imposed specific remedies for the specific deficiencies noted in that case.  Likewise, opinions by members of this Court have rejected wholescale release as an appropriate remedy for problems in the jails, and have favored remediation of any identified problems instead.  *See Williams*, PWG-13-544 (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly.").  As Judge Chuang recognized, even "[i]f the conditions prove to be unacceptable, the solution for [the defendant] will be for the Court to require improvements to the conditions or to have him moved to another detention facility, not to order [the defendant] to be released into the community." *Cleckley*, TDC-18-344 (D. Md.), ECF No. 485.

With respect to the DOC detainees who have tested positive, DOC's medical team and Unity Health Care continue to work with the D.C. Department of Health ("DOH") on contact tracing and to protect the health and wellbeing of other DOC detainees.  As part of these measures, DOC has implemented various levels of quarantine, depending on the inmates' symptoms and

potential contact with infected individuals.  Moreover, while the defendant points to the numbers

of detainees who have tested positive, and the rate at which the numbers have increased, as

Magistrate Judge Day has recognized, "medical experts have universally and correctly predicted

that the raw numbers of those who would be infected would multiply.  This fact has borne true no

matter when in the country the virus has appeared. . . . Merely casting numbers about the rising

infection rate, without more, is not helpful."  *Ray*, TDC-19-215, ECF No. 76 at 4.  Moreover, the

defendant's motion neglects to mention that, as of April 20, 2020, at least 50 DOC detainees who

previously tested positive for COVID-19 have since recovered and are no longer in isolation.

In short, the DOC's response to this unprecedented pandemic is rapidly evolving as it

endeavors to implement measures recommended by the CDC and D.C. Department of Health, as

well as the series of measures ordered by Judge Kollar-Kotelly.  COVID-19 is not a problem that

afflicts DOC facilities alone, and DOC continues to improve its response to the outbreak in its

facilities.  The defendant has not shown that any risk he faces of contracting COVID-19 within

DOC facilities merits release when weighed against the other Bail Reform Act factors this Court

must take into account and the continued corrective measures being implemented by DOC.  *Gray*,

GJH-19-0407 (D. Md.), ECF 120 ("COVID-19 is not a virus that has specifically attacked the D.C.

Jail but, rather, a global pandemic that all citizens of the world are struggling to combat.  There is

no reason for the Court to believe that the jail is not taking reasonable precautions to prevent spread

within the facility nor is there reason to believe that [the defendant] would not be provided with

appropriate medical care if he were unfortunate enough to join the hundreds of thousands of people

who have been inflicted with the virus.").

B.      **The Defendant's Individual Circumstances Do Not Merit Release.**

The defendant's asthmatic condition does not change the analysis. The defendant alleges that he suffers from asthma. As a preliminary matter, the defendant has not provided any documentation of his medical condition. *See United States v. Dante Williams*, PWG-19-0008 (D. Md.), ECF 66 (Order by Magistrate Judge Day), at 3–4 (denying emergency motion for pretrial release based on COVID-19 and noting that the defendant did not "provide[] medical records which substantiate his claim that he has asthma").

In any event, this Court has recently denied a number of motions by detainees claiming that they had medical conditions that made them uniquely vulnerable to COVID-19, including detainees with far more serious medical conditions than [defendant]. *See, e.g.*, *Martin*, PWG-19-140 (D. Md.), ECF No. 209 (denying motion for pretrial release by detainee suffering from "diabetes, high blood pressure, asthma, and pain"); *Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (denying a similar motion by a defendant suffering from diabetes, even though "experts on COVID-19 have stated that individuals with diabetes are at a higher risk of experiencing more serious complications if infected with the virus"), *aff'd* ECF No. 92 (Order by Judge Chuang); *Parker*, TDC-18-344 (D. Md.), ECF No. 478 (denying motion for pretrial release by a detainee who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection"); *Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (asthma); *Williams*, PWG-13-544 (D. Md.), ECF No. 94 (67-year-old defendant); *Gray*, GJH-19-407, ECF No. 120 ("open heart surgery as a child, requires regular EKGs, and continues to experience a diminished immune system, heart flutters, and shortness of breath"); *Tucker*, GJH-19-555 (D. Md.), ECF No. 26 ("a respiratory condition (severe asthma), high blood pressure, and

high cholesterol"; "Defendant at no point provides medical records which substantiate his claims"); *Christian*, DKC-20-19 (D. Md.), ECF No. 23 (asthma); *Pate*, PWG-17-236 (D. Md.), ECF No. 53 (asthma); *Attia*, PWG-19-193 (D. Md.), ECF No. 53 (asthma, migraines); *Bland*, PWG-15-141 (D. Md.), ECF No. 95 (asthma, seizures).]

While the COVID-19 virus is new, health claims by detainees are not.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted.  *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008).  These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide care superior to what a defendant can obtain on the outside.  *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).  In this case, the defendant simply has not made a factual record that his medical needs will not be met while detained.  Granting a defendant's motion for release based on the general threat of harm posed by COVID-19 to all flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Furthermore, the defendant's proposed placement outside of the facility does not eliminate the danger of contracting COVID-19.  The defendant proposes his mother as his third party custodian, but fails to outline whether pretrial finds his mother or her residence appropriate. Additionally, there is no mention of the third party custodian's job situation.  If his mother works, then her job situation should also be considered since it may involve interacting with others and leaving the home.  *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread of the virus in the general public as well").

Furthermore, the defendant has provided no release plan as to how he would avoid or mitigate the risk of COVID-19 should he be released to his proffered third-party custodian. Without the ability to detail who all lives in the suggested home as well as who all frequent said residence, and the ability to identify screening practices or concrete COVID-19 precautions at the residence, the limited and strictly enforced access to jails better "serves to minimize Defendant's COVID-19 exposure." *United States v. Smoot*, Crim. No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020)."

Moreover, the defendant's multiple violations while under court supervision demonstrate he is not a good candidate for community supervision. Just as he could not be trusted to comply with the conditions of his supervision in prior cases, he cannot be trusted to adhere to the social distancing guidelines that are so necessary to protect not only his own health, but the health of the community. *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

### C.   Traditional Location Monitoring Is No Longer An Option for Pretrial Services.

Pretrial Services now has diminished ability to monitor defendants on home detention. Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts. Although other forms of home detention are still available, "none provides 24/7 monitoring and notification." *Gibson-Bey*, RDB-19-563 (D. Md.), ECF 2, at 3 n.2. Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19.  *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

IV.   **[If Defendant Invokes § 3142(i): The Defendant Has Not Met His Burden of Showing that Temporary Release is "Necessary" Under 18 U.S.C. § 3142(i)**

The defendant requests release to home confinement until the "danger of this pandemic has subsided."  ECF 181 at 4.  However, the Court should also deny the defendant's request for temporary release under 18 U.S.C. § 3142(i).  Section § 3142(i) of the Bail Reform Act permits the "temporary release" of a pretrial detainee "in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  The defendant bears the burden of showing that temporary release is "necessary" under this section.  *See United States v. Dupree*, 833 F. Supp. 2d 241 (E.D.N.Y. 2011); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).  Moreover, requests for temporary release cannot "be analyzed in a vacuum"; rather, the court must "balance the reasons advanced for such release against the risks that were previously identified and resulted in an order of detention."  *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020); *see also United States v. Eley*, No. 20 CR 78-3, 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020)

(compelling reasons under § 3142(i) must be balanced "against the risks that were previously identified and resulted in an order of detention") (internal quotation marks and citation omitted).

Recently, in *United States v. Green*, CCB-19-0539 (D. Md. Apr. 15, 2020) (Coulson, J.), the court addressed a § 3142(i) temporary-release request by an inmate at CTF who had "underlying health conditions of asthma, high blood pressure and chronic obstructive pulmonary disease[,] putting him at particular risk for complications should he contract [COVID-19]." *Id.* at 2. The court found, first, that temporary release was not necessary for preparation of the defense, as "the restrictions imposed at CTF are reasonable, necessary, and temporary," and "all cases have been postponed by this Court's most recent Standing Order through June 5, 2020." *Id.* at 5. Turning to the question whether there was "other compelling need" for release, the court focused on four factors: "(1) [t]he original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and, (4) the likelihood that a defendant's release would increase the COVID-19 risks to others." *Id.* at 5–6 (citing *United States v. Clark*, 2020 WL 1446895 (D. Kan. Mar. 25, 2020)). The court found that notwithstanding the defendant's underlying health conditions, the other factors weighed against release. First, the original reasons for detention were "strongly in the Government's favor." Second, the defendant's poor performance on community supervision in the past raised concerns "not only that he would comply with release conditions, but also that he would comply with advice from public officials and public health experts regarding COVID-19 precautionary measures." *Id.* at 6. Finally, the court found that the family members whom the defendant proposed as third-party custodians were not "appropriate person[s]" within the meaning of § 3142(i) who could ensure the defendant's compliance with conditions of release. *Id.* at 6–7.

As far as the Government is aware, every other judge in this district to have considered a request for temporary release under § 3142(i) based on the COVID-19 pandemic has denied it. *See United States v. Brown*, No. CCB-19-576, 2020 WL 1554059 (D. Md. Apr. 1, 2020) (Copperthite, J.) (finding that § 3142(i) "relates to temporary release to the U.S. Marshals or other authority for situations such as funeral attendance or other limited specific reasons, not the pandemic outbreak of COVID-19"); *United States v. Moran*, No. SAG-19-0585, 2020 WL 1663366 (D. Md. Apr. 3, 2020) (Copperthite, J.) ("It is this Court's position that 3142(i) is reserved for very limited purposes such as funeral attendance or other law enforcement (USMS) supervised activity, not release during a pandemic."); *United States v. Parker*, No. TDC-18-0344 (D. Md. Mar. 21, 2020) (Chuang, J.) (denying release under § 3142(i) based on risk of contracting COVID-19, even though defendant had diabetes and other serious health conditions); *United States v. Arsenio Cleckley*, TDC-18-0344 (D. Md. Apr. 8, 2020) (Chuang, J.) (denying release under § 3142(i), notwithstanding COVID-19 outbreak at CTF where defendant was housed, where defendant had pled guilty to gun and drug offenses and did not have any "high-risk health conditions").

Courts in other districts have agreed that generalized claims about COVID-19—whether centered on the risk of becoming ill from the disease, or unavoidable disruptions in access to counsel during the pandemic—do not constitute compelling reasons justifying temporary release under § 3142(i). *See, e.g.*, *United States v. Joshua White*, No. 19-mj-00203 (DAR) (D.D.C. Apr. 2, 2020) (finding that COVID-19 outbreak in D.C. facility where defendant was housed was not a "compelling reason" supporting release under § 3142(i) where defendant did "not claim to have health conditions or other circumstances that make him particularly vulnerable to the virus," and cited only generalized risks that "apply to all incarcerated individuals"); *United States v. Lee*, No.

19-cr-298 (KBJ), 2020 WL 1541049 (D.D.C. Mar. 30, 2020) ("[T]his Court agrees with those recent precedents that have rejected emergency motions for release of otherwise healthy and potentially violent defendants based solely on the generalized risks that COVID-10 admittedly creates for all members of our society."); *United States v. Chambers*, No. 20-CR-135 (JMF), 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (finding that temporary release was not "necessary" for the preparation of the defense where defendant's pretrial conference was "not even scheduled for another month"); *United States v. Anderson*, No. 19-CR-771 (S.D.N.Y. Mar. 27, 2020) (finding that the risk of contracting COVID-19 was not a "compelling reason" justifying temporary release under § 3142(i) where defendant was a "healthy 40-year-old man, with no unusual medical conditions"); *United States v. Clark*, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (denying release based on individualized assessment of § 3142(g) risk factors, even though defendant had diabetes, and finding that "a defendant should not be entitled to temporary release under § 3142(i) based solely on" COVID-19 concerns); *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020) (rejecting request for temporary release under § 3142(i), finding that danger to the community outweighed risk presented by COVID-19 for 60-year-old defendant with diabetes, and jail's temporary suspension of in-person legal visits did not render release necessary for preparation of the defense).

Here, the defendant has not offered any evidence undermining the court's initial conclusion on July 19, 2019 that the defendant is not a danger to the community. Moreover, as in *Green*, the defendant's poor performance on community supervision means he is unlikely to comply with safety precautions designed to reduce risk of contracting and spreading COVID-19, just as he is unlikely to comply with the other conditions of release. *See Green*, CCB-19-0539 (D. Md. Apr. 15, 2020).

**<u>Conclusion</u>**

For the foregoing reasons, the Court should deny the defendant's motion for release.


Respectfully submitted,

Robert K. Hur
United States Attorney

By:   _LaRai Everett_____

LaRai Everett
Michael Hanlon
Assistant United States Attorneys